IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| PUBLIC UTILITY DISTRICT NO. 1 OF CHELAN COUNTY, a municipal corporation, | ) ) ) ) | No. 40212-6-III |
| Respondent, | ) ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| PUBLIC UTILITY DISTRICT NO. 2 OF GRANT COUNTY, a municipal corporation, | ) ) ) ) ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — Public Utility District No. 2 of Grant County (Grant) appeals the trial court's summary judgment order construing the parties' contracts in favor of Public Utility District No. 1 of Chelan County (Chelan). We conclude there is no genuine issue of material fact, that the 1955 agreement between the parties unambiguously requires Grant to fully compensate Chelan for all loss, damage, and expense Chelan sustains by reason of Grant's construction of the Wanapum Dam and, in the context of this dispute, requires Grant to return hydropower for hydropower. We further conclude that Grant's unjust enrichment counterclaim against Chelan is barred by the three-year statute of limitations and that the period of limitations should not be equitably tolled. We affirm the trial court's summary judgment order.

FACTS

Grant and Chelan are two public utility districts located in the mid-Columbia River basin, and both own and operate hydroelectric dams. In 1955, Grant proposed to construct two hydroelectric dams, termed the "Priest Rapids Hydroelectric Development," downstream from Chelan's existing Rock Island Dam. Clerk's Papers (CP) at 11-12. Grant's construction of the upper dam, Wanapum Dam, would encroach on the tailwaters of Chelan's upstream Rock Island Dam, reducing that dam's capacity to generate power. To facilitate regulatory approval for its new project, Grant agreed to fully compensate Chelan. The agreement, referred to as the "1955 Agreement," provides in relevant part:

> 1. Grant agrees to fully compensate Puget[1] and Chelan and each of them or their successors in interest in the Rock Island Project for all loss, damage and expense which Puget and Chelan or either of them or their successors in interest in the Rock Island Project shall sustain or incur by reason of the construction or operation of said Priest Rapids Hydroelectric Development or any part thereof. . . .
> 2. Without limiting the generality of the foregoing, Grant agrees regarding loss of power and energy, to compensate Puget and Chelan for all loss in the generation of power and energy at the Rock Island Project which shall result from the backwater of the Wanapum Project . . . to the end that the amount of power and energy available to Puget and Chelan from the Rock Island Project . . . shall at all times equal the power and energy which would have been available to Puget and Chelan at the Rock Island Project in the absence of said Priest Rapids Hydroelectric Development.

---

[1] Puget Sound Power & Light Company co-owned the Rock Island Project with Chelan until Chelan purchased its interest in early 1956.

Clerk's Papers (CP) at 56-57. The agreement does not state the source of power, hydropower or otherwise, that Grant is required to return to Chelan.

Grant and Chelan later entered into the "1967 Agreement." CP at 60. This agreement established how the encroachment losses at the Rock Island Project would be calculated and how Grant would deliver replacement power to Chelan. The 1967 Agreement provides that "[n]othing contained in this agreement shall be construed as altering, amending or abrogating in any manner the agreement of August 8, 1955, . . . and said agreement shall be and remain in full force and effect." CP at 68. Although the agreement explains in great detail how the amount of return power will be calculated, it likewise does not state the source of power that Grant is required to return to Chelan.

In 1973, Chelan sought to add a second powerhouse to the Rock Island Project. This caused a dispute between Grant and Chelan about the second powerhouse's effect on the 1967 Agreement. They entered into the "1974 Agreement," wherein Grant agreed to compensate Chelan for the total power loss at the first powerhouse and one-half of the power loss at the second powerhouse. CP at 15, 99. The 1974 Agreement terminated the 1967 Agreement, but not the 1955 Agreement.

The 1974 Agreement reads in relevant part:

RECITALS

. . . .

7.   Grant and Chelan have long been in disagreement as to the proper interpretation of the 1955 Agreement, Grant contending that the agreement was intended to indemnify for loss only at Rock Island as it existed in 1955, and Chelan contending that the agreement was intended to indemnify for loss resulting to any expanded project as well as the project as it existed in 1955. . . .

. . . .

9.   In order to resolve the dispute between them and to resolve all present and future controversy relative to this matter between them, the parties enter into this agreement.

. . . .

SECTION II—DEFINITIONS

. . . .

(d)  Encroachment Power shall mean the electrical capacity and energy due to Chelan from Grant under the provisions of this agreement.

. . . .

SECTION V—DETERMINATION OF AMOUNTS OF ENCROACHMENT POWER

[T]he amount of Encroachment Power which is to be delivered to Chelan simultaneously with the loss of power and energy by reason of encroachment shall be computed and determined according to the principles and formula set forth in Exhibit "A". Encroachment power will be computed and delivered on operable units only.

. . . .

SECTION IX—EFFECT ON 1967 AGREEMENT

This agreement is intended to fully supersede and replace the 1967 Agreement when Chelan has installed and made operable one or more generating units in the Added Plant . . . .

SECTION X—EFFECT ON 1955 AGREEMENT

The parties intend and agree that the covenants to be performed by Grant under this agreement and performance thereof are accepted by Chelan as full and satisfactory performance of Grant's obligations under the 1955 Agreement. Chelan accepts Grant's covenants herein to deliver Encroachment Power and performance of the covenants herein in lieu of any claim on the part of Chelan for any loss or damage to Chelan or the Existing Plant or Added Plant, arising under the 1955 Agreement, whether such loss or damage relates to loss of power and energy or otherwise without limitation.

CP at 99-105. Like the 1955 and 1967 Agreements, the 1974 Agreement does not state the source of power, hydropower or otherwise, that Grant was required to return to Chelan.

From 1973 until 2019, the parties accounted for and organized the delivery of encroachment power through an "Hourly Coordination Agreement." CP at 17, 1104. Under this agreement, "the encroachment power was accounted for as Rock Island Project generation, even though the physical generation occurred at Wanapum Dam." CP at 17. This led the encroachment power to be accounted for as hydropower generated at the Rock Island Project. In 2019, Grant changed to a dynamic schedule, which delivers the same amount of power but does not account for it as hydropower from the

Rock Island Project, but rather as undifferentiated imported power from Grant County. This change prompted the present litigation.

In May 2020, Chelan filed this action for declaratory and injunctive relief, seeking a declaration that Grant was contractually obligated to provide encroachment power from hydropower sources and an injunction preventing Grant from delivering encroachment power from nonhydropower sources.

Chelan argues that only hydropower satisfies Grant's duties under the various agreements. Using language from paragraph 1 of the 1955 Agreement, Chelan argues that Grant must "fully compensate" it for "all loss, damage and expense" sustained by it due to the operation of the Wanapum Dam, and the market value of hydropower is greater than undifferentiated sources. CP at 56. Using language from paragraph 2 of the 1955 Agreement, Chelan additionally argues that the "loss of power and energy" from the Rock Island Project is hydropower and that Grant is required to provide encroachment power that is "equal [to] the power and energy" that would have been available to Chelan if the Wanapum Dam had not been constructed. CP at 56-57.

Grant admits that it delivered some of the encroachment power from hydropower sources, but it denies ever exclusively providing it from hydropower sources. It alleges it has always delivered system power regardless of source. It characterizes the Hourly Coordination Agreement as delivering power from Grant's balancing authority,

"includ[ing] any power purchase contained in or delivered to the Grant BA," rather than the Wanapum Dam specifically. CP at 44. Although Grant admits that hydropower has a higher market value than other forms of power, it claims that this is irrelevant to the parties' agreement, which does not require a particular form of encroachment power to be delivered.

In October 2022, Grant filed a counterclaim for unjust enrichment, asserting that it overdelivered power to Chelan in 2015, and Chelan had only partly reimbursed it. It sought a declaration that it was not required to return hydropower for hydropower, judgment for its unjust enrichment counterclaim, and reasonable attorney fees and costs. Chelan responded that Grant's counterclaim was barred by the three-year statute of limitations.

In early 2023, Grant moved for partial summary judgment. In its motion, it argued that none of the parties' written agreements specified the source of the power to be delivered, only the amount. It also argued that this interpretation comports with the course of performance under the agreements.

Chelan, in opposing Grant's motion, argued that the agreements do not specify the source of the power because the context and circumstances surrounding the agreements made it clear that the only power being discussed was hydropower. To support its position, Chelan included a 2014 e-mail exchange between one of Grant's employees and

one of its employees discussing the 2019 change from a pseudo-tie to a dynamic schedule. Grant's employee wrote, "We plan to implement a dynamic signal. A pseudo-tie would be appropriate if the Encroachment Agreement gave Chelan a slice of [Wanapum]. However, the Agreement only creates an obligation for Grant to deliver certain quantities of energy and capacity, without specifying that they come from [Wanapum]." CP at 325. Chelan's employee responded by saying that "[b]oth Grant and Chelan historically have treated the encroachment power as being sourced from [Wanapum Dam's hydropower] in reports and descriptions of the projects" and characterizing Grant's position as "a significant change from past practices." CP at 324.

Chelan also included evidence that Grant had accounted for its transfer of encroachment power to Chelan by subtracting it from the Wanapum Dam and Priest Rapids Project hydrogeneration. Similarly, in filings with the Federal Energy Regulatory Commission, Grant accounted for the Rock Island encroachment in its Priest Rapids Hydroelectric Project generation.

On February 10, 2023, the trial court denied Grant's motion for summary judgment, concluding that Grant had failed to show that there are no genuine issues of material fact.

On November 20, 2023, Chelan moved for summary judgment. It argued that "the only type of generation equal to that which Chelan could generate at Rock Island in

Wanapum's absence is hydropower. The Parties refer to the hydropower Grant owes Chelan as 'encroachment power.'" CP at 1092. As part of its motion for summary judgment, Chelan included a partial transcript of the deposition of Grant's former general manager Kevin Nordt where he states that "'encroachment' is a term that is used in hydroelectric power." CP at 914. He further indicated that he was not aware of the term being used in relation to other forms of power generation.

In its motion for summary judgment, Chelan also quoted from a joint statement issued by itself and Grant just before signing the 1974 Agreement, which read: "'[I]n accordance with agreements between the two Districts, Wanapum returns on a continuous basis the capacity and energy to keep Rock Island generation equivalent to what the Rock Island Plant could have generated under the same situation had the Wanapum Reservoir not existed.'" CP at 1099. Chelan argued that because Wanapum returns only hydropower, this joint statement confirmed the parties' practice that Grant had always returned hydropower for hydropower.

Chelan also addressed Grant's unjust enrichment claim. It denied owing "Grant anything for the period between July 9, 2014 and August 4, 2014, which constitutes the remaining $376,108.45 that Grant now claims in this lawsuit." CP at 1111. Chelan argued that it was entitled to summary judgment because the three-year statute of limitations had expired.

Grant filed a cross motion for summary judgment. It argued that the agreements, by their plain terms, address only the amount of energy to be delivered and not its source. It also disputed that it had provided exclusively hydropower in the past, arguing instead that the evidence showed it had provided undifferentiated system power. It argued that both entities knew how to draft agreements specifying the source of power but had not done so.

Grant further noted that when the parties began their negotiations in the 1950s, the energy market did not differentiate different sources of power. It was not until the 1990s that a separate market began to emerge for differentiated power sources, such as green energy. Further, it was not until the 2010s that hydropower could be sold for higher prices than undifferentiated power. According to Grant, Washington utilities were not forced to track or care about the generating source of power until the early 2000s.

Grant's opposition to Chelan's summary judgment motion addressed the statute of limitations concerns. It alleged that the parties had been in continuous negotiations over the disputed amount since 2015. It argued that the three-year statute of limitations should be equitably tolled because either Chelan was negotiating in good faith—in which case the claim had not yet accrued—or it was negotiating in bad faith—in which case Grant would meet the requirements to have the statute of limitations equitably tolled.

On January 5, 2024, the trial court granted summary judgment for Chelan. It concluded that the only reasonable interpretation was that Grant had to provide encroachment power from a hydropower source, i.e., hydropower for hydropower. It further concluded that Grant had represented to Chelan and others that the encroachment power was from hydropower sources. It found no genuine issue of material fact about whether the statute of limitations on Grant's unjust enrichment claim had run—it had. Grant appeals the trial court's summary judgment order to this court.

ANALYSIS

We review summary judgment orders de novo and engage in the same analysis as the trial court. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). We consider the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Rinehold v. Renne*, 198 Wn.2d 81, 96, 492 P.3d 154 (2021). Summary judgment is appropriate only if the sworn pleadings submitted with the motion show there is no genuine issue as to any material fact. CR 56(c). A genuine issue of material fact exists when reasonable minds could differ on the facts that control the outcome of the case. *Dowler v. Clover Park Sch. Dist. No. 400*, 172 Wn.2d 471, 484, 258 P.3d 676 (2011).

GRANT'S CONTRACTUAL OBLIGATION

Grant argues the trial court erred by concluding as a matter of law that it was contractually obligated to return hydropower for hydropower. We disagree.

11

In *GMAC v. Everett Chevrolet, Inc.*, we set forth several principles that govern our review here:

> "The touchstone of contract interpretation is the parties' intent." "Washington courts follow the objective manifestation theory of contracts, imputing an intention corresponding to the reasonable meaning of the words used."
> "An interpretation which gives effect to all of the words in a contract provision is favored over one which renders some of the language meaningless or ineffective." "A court will not read ambiguity into a contract where it can reasonably be avoided."
> Whether a contract is ambiguous is a question of law. A contract provision is not ambiguous merely because the parties to the contract suggest opposing meanings. "If only one reasonable meaning can be ascribed to the agreement when viewed in context, that meaning necessarily reflects the parties' intent; if two or more meanings are reasonable, a question of fact is presented." Summary judgment as to a contract interpretation is proper if the parties' written contract, viewed in light of the parties' other objective manifestations, has only one reasonable meaning.

179 Wn. App. 126, 134-35, 317 P.3d 1074 (2014) (footnotes and internal quotation marks omitted) (quoting *Realm, Inc. v. City of Olympia*, 168 Wn. App. 1, 4-5, 277 P.3d 679 (2012); *Seattle-First Nat'l Bank v. Westlake Park Assocs.*, 42 Wn. App. 269, 274, 711 P.2d 361 (1985); *Mayer v. Pierce County Med. Bureau, Inc.*, 80 Wn. App. 416, 421, 909 P.2d 1323 (1995); *Martinez v. Kitsap Pub. Servs.*, 94 Wn. App. 935, 943, 974 P.2d 1261 (1999)).

In paragraph 1 of the 1955 Agreement, Grant agreed to "fully compensate" Chelan "for all loss, damage and expense" it sustained "by reason of the construction or

12

operation of" the Wanapum Dam. CP at 56. It is undisputed that the value of

hydropower is greater than undifferentiated power—the type of power Grant presently is

returning to Chelan. It is further undisputed that Chelan would have had this additional

hydropower had Grant not constructed the Wanapum Dam. We conclude, by returning

undifferentiated power, which has a lower market value, Grant is not fully compensating

Chelan for its "loss, damage and expense." We also conclude that this obligation in the

1955 Agreement is unambiguous.[2]

Grant has two counterarguments why paragraph 1 of the 1955 Agreement is either

ambiguous or does not control. Its first counterargument focuses on paragraph 2 of the

---

[2] A court may consider the actions of the parties after they signed their contract as evidence of their mutual intent at the time of signing. *City of Union Gap v. Printing Press Props., LLC*, 2 Wn. App. 2d 201, 225, 409 P.3d 239 (2018). The 1974 joint statement by the parties, quoted earlier, supports Chelan's argument that the parties had always returned hydropower for hydropower. Grant's counterevidence—about using its own undifferentiated sources—relies either on its early unilateral practice (unknown to Chelan) or on a new practice begun in 2019 and is thus not evidence of the parties' mutual intent at the time they signed the 1955 Agreement.

1955 Agreement.[3]  Grant argues that, under this provision, its responsibility is limited to returning to Chelan the same *amount* of power Chelan lost by reason of its construction of the Wanapum Dam.  We disagree.  In making this argument, Grant ignores paragraph 2's opening phrase, "Without limiting the generality of the foregoing."  "Foregoing" means "listed, mentioned, or occurring before."  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 490 (11th ed. 2003).  Grant's argument requires us to ignore the generality of paragraph 1, which requires Grant to fully compensate Chelan for its loss, damage and expense.  We decline to ignore paragraph 2's opening phrase.  *See Wagner v. Wagner*, 95 Wn.2d 94, 101, 621 P.2d 1279 (1980) ("An interpretation of a writing which gives effect to all of its provisions is favored over one which renders some of the language meaningless or ineffective.").  For this reason, we reject Grant's first counterargument.

---

[3] For the reader's benefit, we again quote the relevant language of paragraph 2 of the 1955 Agreement:

> *Without limiting the generality of the foregoing*, Grant agrees . . . to compensate . . . Chelan for all loss in the generation of power and energy at the Rock Island Project which shall result from the backwater of the Wanapum Project . . . to the end that the amount of power and energy available to . . . Chelan from the Rock Island Project . . . shall at all times equal the power and energy which would have been available to . . . Chelan at the Rock Island Project in the absence of [the Wanapum Dam].

CP at 56-57 (emphasis added).

Grant's second counterargument focuses on section X of the 1974 Agreement.[4] Grant argues that, under the 1974 Agreement, its 1955 obligation to fully compensate Chelan for any loss, damage and expense became limited to returning undifferentiated power. In making this argument, Grant emphasizes that nothing in the agreement requires encroachment power to be hydropower. Once again, we disagree with Grant. While nothing in the agreement requires encroachment power to be hydropower, nothing in the agreement permits encroachment power to be undifferentiated power. We conclude that nothing in the 1974 Agreement alters Grant's obligation to fully compensate Chelan for all loss, damage and expense.

In summary, the parties' agreements are unambiguous with respect to the present dispute. The 1955 Agreement requires Grant "to fully compensate . . . Chelan . . . for all loss, damage and expense which . . . Chelan . . . shall sustain or incur by reason of the

---

[4] For the readers benefit, we again quote the relevant language of section X of the 1974 Agreement:

> The parties intend and agree that the covenants to be performed by Grant under this agreement and performed thereof are accepted by Chelan as full and satisfactory performance of Grant's obligations under the 1955 Agreement. Chelan accepts Grant's covenants herein to deliver Encroachment Power and performance of the covenants herein in lieu of any claim on the part of Chelan for any loss or damage to Chelan or the Existing Plant or Added Plant, arising under the 1955 Agreement, whether such loss or damage relates to loss of power and energy or otherwise without limitation.

CP at 105.

construction or operation of" the Wanapum Dam.  CP at 56.  We reject Grant's

arguments that paragraph 2 of the 1955 Agreement and/or section X of the 1974

Agreement alters its obligations with respect to the present dispute.  We affirm the trial

court's grant of summary judgment on this issue.

EQUITABLE TOLLING OF GRANT'S COUNTERCLAIM

Grant argues the trial court erred by refusing, as a matter of law, to apply equitable

tolling to its 2022 counterclaim that Chelan had been unjustly enriched by not paying for

power Grant overdelivered to Chelan in 2014.  We disagree.

"General jurisdiction courts have the power, in limited circumstances, to equitably

toll a statute of limitations established by the legislature. . . .  Given our due regard for the

legislature, equitable tolling must be applied sparingly but is available when justice

demands it."  *Campeau v. Yakima HMA, LLC*, 3 Wn.3d 339, 341, 551 P.3d 1037 (2024)

(citation omitted).  "'[Washington law] allows equitable tolling [1] when justice requires.

The predicates for equitable tolling are [2] bad faith, deception, or false assurances by the

defendant and [3] the exercise of diligence by the plaintiff.  In Washington equitable

tolling is appropriate [4] when consistent with both the purpose of the statute providing

the cause of action and the purpose of the statute of limitations.'"  *Fowler v. Guerin*, 200

Wn.2d 110, 119, 515 P.3d 502 (2022) (alterations in original) (quoting *Millay v. Cam*,

135 Wn.2d 193, 206, 955 P.2d 791 (1998)).  "The purpose underlying statutes of

16

limitations is to protect against (1) litigating stale claims, (2) loss of evidence, and (3) fading memories." *Campeau*, 3 Wn.3d at 346. "The party asserting that equitable tolling should apply bears the burden of proof." *Trotzer v. Vig*, 149 Wn. App. 594, 607, 203 P.3d 1056 (2009). "Although we give deference to the trial court's factual determinations, we review the decision of whether to grant equitable relief de novo." *Id.*

As to the exercise of diligence by Grant, it is not clear how diligently it worked to resolve the issue. A statement from Grant's former chief executive officer made in a deposition indicated that he was "hoping that the staff was going to continue to work and get [the overdelivery issue] resolved." CP at 1481. At another point in the deposition, he also noted that "in 2016, we were not able to get a resolution. Grant believed this was owed, Chelan said it wasn't, and, again, you know, it was like, well, we're not figuring this out, and my thinking was, well, hopefully at some point in time here we'll be able to get this worked through." CP at 1480. The record does not show significant movement on this issue since 2015 or 2016. Although Grant alleges that the negotiations continued through 2017 and ended sometime between 2017 and 2020, the record does not include these negotiations. *Hoping* that an issue eventually gets resolved is not diligence. Accordingly, given the extraordinary nature of equitable tolling, we cannot conclude that Grant was sufficiently diligent to meet this requirement.

Additionally, it is not clear that Chelan acted in bad faith, nor deceived or falsely assured Grant. The record clearly shows that Chelan did not believe that it owed Grant any payment for an overdelivery. Nevertheless, Chelan retained the disputed liability on its books and tried to negotiate a settlement. We see no evidence of bad faith conduct on Chelan's part, and its bookkeeping entry for such a large potential liability does not appear to be inconsistent with typical business practices.

Given the extraordinary nature of equitable tolling and Grant's failure to adequately show its own diligence or Chelan's bad faith, we conclude, as a matter of law, that Grant has failed to adequately show it is entitled to equitable tolling of its unjust enrichment counterclaim. We conclude that the trial court properly dismissed Grant's counterclaim on summary judgment.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, C.J.

WE CONCUR:

_____       _____
Fearing, J.                                                   Murphy, J.

18